UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

NATHANIEL STANLEY, *et al.*                                      PLAINTIFFS

v.                                          CIVIL ACTION NO. 3:09-CV-00231

INSIGHTS TRAINING GROUP, LLC, *et al.*                          DEFENDANTS

## **MEMORANDUM OPINION**

Plaintiffs Nathaniel Stanley and Darla Flannery claim that they were fired in retaliation for opposing inappropriate relationships between management and staff at their place of employment. However, because the plaintiffs' actions in opposition to those relationships did not constitute protected activities, their claims must be dismissed.

**I.**

The court presents the following statement of relevant facts, which are either undisputed or viewed in the light most favorable to the plaintiffs. Stanley and Flannery were employed by defendant Insights Training Group ("Insights") to work as staff members at the Whitney M. Young Job Corps Center (the "Center"). The Center was  a residential facility that provided job training skills to its students. At any given time, there were 400 to 500 students living at the campus and attending school there. The managers of the Center were employed by defendant Horizon Youth Services, LLC ("Horizon").

In the fall of 2006, Valerie Blakemore, a manager at the Center, saw William Houston, the Assistant Director of the Center, inside a classroom in a "comprising situation" with staff member

Victoria Mott.[1] Blakemore also became aware that Mott was supposedly having an affair with a different manager, Eric Lee, whose wife, Terrie Lee, worked at the Center.[2] In addition, Leondra Scott, another staff member at the Center, told Blakemore that she had an "inappropriate relationship" with her supervisor, Anthony Bolden. According to Blakemore, it was clear to her that staff members that had relationships with managers had job security and were permitted to take unexcused absences and to avoid work, while other employees did not enjoy those perks.

Blakemore told Ian Crump, the Director of the Center, about the staff-management relationships of which she was aware. Crump responded by telling Blakemore that she either had to resign her position or be fired. Blakemore requested a leave of absence due to stress, and was fired within a week of her return. Cora Brown, who had recently began working as the Human Resources Manager at the Center when Blakemore was fired, recalled that Blakemore was terminated due to allegations that she was not doing her job. However, Blakemore denied those

---

[1] The plaintiffs attached to their response to the defendants' motion for summary judgment an affidavit of Valerie Blakemore. The affidavit was signed but not notarized. After the defendants filed their reply papers, the plaintiffs submitted a notarized affidavit of Blakemore; however, that notarized affidavit differed from the un-notarized one that had been attached to the response papers. The defendants moved to strike both of the Blakemore affidavits from the record: the original one because it was not notarized and the second one because it was filed after the defendants had filed their reply. The plaintiffs responded to the motion to strike by filing a third affidavit of Blakemore. That third affidavit was notarized, but in all other respects was the same as the original un-notarized affidavit that had been attached to the plaintiffs' response papers. The plaintiffs explained that the previously-filed affidavits had differed from each other due to a mix-up involving different drafts of the affidavit. In the defendants' reply papers, they stated that they would leave it to the court "to determine whose Affidavit has actually been filed and what, if any, use of it is appropriate." Having reviewed the relevant filings, the court will accept the most-recently submitted third affidavit of Blakemore (DN 52), which is notarized and otherwise the same as the original affidavit submitted with the plaintiffs' response to the summary judgment motion. Accordingly, the differing notarized affidavit (DN 49) will be struck, as will the un-notarized original affidavit (DN 43-2).

[2] In fact, Blakemore stated in her affidavit, Mott was forced to quit because of the affair with Eric Lee.

allegations to Brown and told her that she was being fired because she knew of untoward sexual relationships between managers and staff employees.

In early January 2007, Darla Flannery complained to Brown about Victoria Mott. Flannery stated that Mott was supposed to instruct an afternoon class, but "found a way to get out of it constantly" and "had certain individuals in her office visiting for two to three hours at a time." In February of 2007, Flannery again spoke to Brown. In a confidential report of the conversation, Brown wrote that Flannery believed she was "being targeted by Ms. Mott and was in jeopardy overtime [sic] of losing her job."

Subsequently, Flannery provided Brown a written statement. Flannery stated that Mott could get her "manager buddies" to do what she wants and she "uses those relationships to hurt others." Mott was given "free reign" to do scheduling and make the curriculum, as well as to change jobs or offices. Additionally, Mott had been "rotten" to Flannery. Flannery alleged that Mott had helped get Marlene Wright, Ron Robinson, and Blakemore fired, and had tried to get Bren Young and Flannery fired as well. In the written statement, Flannery also made allegations concerning relationships between various persons that worked at the Center. Flannery related that Scott told her about a bar outing that was attended by, among others, Scott, Bolden, Eric Lee, Terrie Lee, Mott, and Rose Lee.[3] At the bar, various members of the group had "got nasty on the dance floor" and Bolden had said sexually suggestive things to Scott. Flannery also stated that numerous students had made remarks about Mott's relationship to Eric Lee. Flannery further alleged that Rose Lee and Houston were "together in some capacity," and Houston "protect[ed]" Rose Lee so that she could do "whatever she wants." Rose Lee had been rude to Flannery, other staff, and even students. A few

---

[3] Rose Lee is apparently unrelated to Eric or Terrie Lee. To avoid confusion, those three persons will be referred to by their full names throughout this opinion.

days after Flannery provided the written statement to Brown, she told Brown that she did not want

there to be "unfairness in the work place," because it made people "upset in every way."

Brown shared Flannery's concerns with Crump. Brown also requested more information

from Flannery. In a March 6, 2007 email, Flannery stated:

> Unfairness is when Ms[.] Mott is given control of scheduling, curriculum, change job
> positions or offices and we have no say so. . . . She makes sure that it works to her
> advantage, such as taking the afternoon curriculum and less to do. She uses Mr.
> Houston and Mr. Lee to get what[]ever she wants.

Flannery further stated that Mott "treated [her] rotten" and "bullied" her and others. Mott did not

do her own job, but still complained about other people's work. Additionally, Flannery noted that

Stanley had related to her that on at least one occasion Mott and Eric Lee had gone into Mott's

office, shut the door, and stayed there for hours. According to Flannery, "Ms[.] Mott shouldn't be

visiting for hours on end with a married man with the door shut. His wife works here; he obviously

doesn't care that it looks bad." In Flannery's opinion, Mott's actions were "unethical." Flannery

stated, "The behavior that needs stopped [sic] is Ms [sic] Mott not being allowed to judge us at all."

Noting that many of Mott's other co-workers had issues with Mott, Flannery stated that it was

"obvious where the trouble lies."  Flannery believed that  Mott should "get in trouble," "only be

allowed to talk about herself," and be stopped from "flirting."

Flannery also complained about Scott in the e-mail, stating that Scott had no "integrity" and

had "lied" about having an affair with Bolden so that he would not "lose his good paying job." Scott

also openly talked about "immoral things." Flannery further stated that Rose Lee "got extremely

cocky after becoming close with Mr. Houston," although Flannery was apparently unsure of the

exact nature of Rose Lee's relationship with Houston. Flannery stated that she "wonder[ed] if these

females use the managers just to get what they want sometimes."

- 4 -

On the same day that Flannery sent the email to Brown, she also met with Brown to discuss her expectations for resolution of the issues. Flannery told Brown that Mott should "stop worrying about how [Flannery] performs her job." Flannery and Brown brainstormed appropriate responses to negative comments made by Mott. Flannery agreed that in the case of future disagreements between her and Mott, Flannery would suggest to Mott that the two meet with their supervisor, Charles Hobbs. After the discussion, Flannery told Brown that she considered the matter closed.

Meanwhile, Stanley had noticed that Houston visited Rose Lee every morning and evening and he had seen them embracing once. Additionally, Stanley noticed that Eric Lee would go to Mott's office every morning and evening, and sometimes during class sessions. Lee and Mott would close the door and the blinds. One time, they spent a half day or more in Mott's office with the door closed.

Stanley and Bren Young scheduled a March 1, 2007 meeting with Brown. According to a written report of that meeting, Young and Stanley alleged the following: "[c]ertain managers seem to spend an inordinate amount of time with certain employees"; "[c]laims of retaliation and favoritism are real"; "[c]laims of unfair distribution of the workload are real, i.e., some staff with lots of slack time (Scott and Mott), others with little time to accomplish all that is expected"; "[i]nteractions of senior managers with certain staff members are inappropriate, disruptive to the work and learning environment (students have noticed and commented)"; "[s]tudent(s) reported seeing staff (Scott, Mott, Houston) at a club"; "[m]ale students interact with Ms. Mott in ways that are inappropriate, too familiar"; and "Ms Mott tries to control what's going on in the classroom and uses her relationship with Mr. Le[e] to get Mr. Houston to use his position to see that she gets her way." Stanley and Young specifically identified Mott and Eric Lee as having a sexual relationship,

- 5 -

and may have reported that Bolden was having an affair with Scott and that Houston and Rose Lee were involved in a relationship.

Stanley also spoke to Charles Hobbs, who was his supervisor as well as Flannery's. Stanley told Hobbs that female staff members were receiving favorable treatment, and Hobbs responded that he knew "what's going on," but did not want to get involved. In fact, other persons had also approached Hobbs and talked to him about allegations of relationships between Houston and Rose Lee, Eric Lee and Mott, and Scott and Bolden. Hobbs had personally noticed that Houston spent an inordinate amount of time in Rose Lee's office during non-class hours and Eric Lee spent a lot of time socializing with Mott. Because the allegations concerning the relationships between managers and staff was becoming "poisonous" to Hobbs' department, he spoke to his supervisor, Dorothy Mauzy, about the allegations; she said she would look into them.[4]

Beyond Flannery and Stanley's complaints, Brown had also heard other people complain and make "snide remarks" about the relationships between members of management and employees. For instance, Brown had been told that Eric Lee and Mott had been spotted together socially after regular work hours, as had Houston and Rose Lee and Scott and Bolden. However, nobody else wanted to make a formal complaint regarding the relationships.

---

[4] In his deposition testimony, Hobbs testified that he did not feel that Mott, Scott, or Rose Lee were "shirking their responsibilities" nor did he think that Stanley had to cover an "inordinate amount of items" for those three. He reported the allegations to Mauzy only because they were so poisonous to the atmosphere of his department. However, in a later affidavit, Hobbs stated that Rose Lee had been "excessively absent" and that other employees – including Stanley and Flannery – bore an "undue burden" in covering for Rose Lee. Hobbs also stated in the affidavit that Mott and Rose Lee were allowed to do "whatever they pleased," and anyone who complained about those two was fired; thus, Hobbs "did not make any futile attempts to discipline Rose Lee or Victoria Mott." Hobbs explained the difference between his deposition testimony and his averments in the affidavit by stating that his deposition had occurred over four years after the events in the case and he had not remembered all the details at the time of the deposition.

Brown reported to Director Crump that there were "rumors and innuendos floating around" about inappropriate relationships and that she had received a complaint "substantiating those rumors." Brown told Crump about the allegations that Eric Lee and Mott had a relationship, as a result of which Mott was not sufficiently doing her job. Brown also voiced a worry that, because Terrie Lee also worked at the Center, there could be some sort of altercation arising out of Mott and Eric Lee's relationship; Crump replied that he was aware of the allegations and had informed Eric Lee that in the event of any such an incident, Eric Lee would be fired. Brown stated that somebody told her that Eric and Terrie Lee had already had a shouting match, during which Terrie Lee accused Eric of having an affair; Crump said he had already handled that.

In April 2007, prior to finishing her investigation of Stanley and Flannery's complaints, Brown was fired for reasons unrelated to those complaints. However, Brown had come to believe that the Center tolerated sexual relationships between management and employees and that favoritism for employees who were in sexual relationships with managers was pervasive.

Meanwhile, the security staff at the Center notified Director Crump that Stanley had been present at the Center beyond the students' curfew and on weekends. On May 16, 2007, Hobbs met with Stanley to discuss the Center's policies concerning after-hours work. Hobbs did not feel that it was an issue for Stanley, a salaried employee rather than hourly employee, to work beyond normal hours. However, at the request of Center management Hobbs talked to Stanley and told Stanley to let Hobbs know if Stanley needed to stay late; Stanley could assume that Hobbs approved of Stanley staying late unless Hobbs let Stanley know that he disapproved. Additionally, during the meeting, Hobbs also discussed with Stanley an allegation that Stanley had made an inappropriate comment to someone, which Hobbs had investigated and determined to be unfounded.

During the weekend of June 8-10, 2007, Stanley worked past normal hours. Stanley sent emails or notes to Hobbs about staying late; Hobbs did not respond to those messages. According to Hobbs, Stanley had his approval to work late on those days. Later, a member of the Center IT Department reviewed Stanley's computer and discovered that he had visited sports-related non-work websites while he was working late.

On June 29, 2007, a day when Hobbs was not at work, Assistant Director Houston fired Stanley. The Center's proffered reasons for Stanley's termination were his alleged failures to comply with workplace policies concerning after-hours work and internet usage, as well as his supposedly "threatening" reaction to finding out from Hobbs about the unfounded allegation that he made an inappropriate comment to someone – a reaction that Hobbs denied Stanley had. In fact, in Hobbs' opinion, Stanley had not committed any fireable offense; Hobbs felt that Stanley was a "consummate employee." Hobbs believed Stanley was "target[ed]," and could not recall any employee other than Stanley that was fired for working during nonscheduled hours or for visiting inoffensive non-work websites.

On July 3, 2007, less than a week after he was fired, Stanley wrote a letter to the United States Department of Labor ("DOL"). In the letter, Stanley expounded upon the working environment at the Center, the allegations of sexual relationships and related favoritism for certain employees, and the events leading up to his firing. He concluded that he believed he was fired by Houston as retaliation for his complaints and requested that the DOL conduct an investigation into the matter. Stanley attached to the letter various documents related to his statements in the letter. Some of the documents contained the names of and information about specific students.

As a result of Stanley's letter to the Department of Labor, Horizon representative Emmett Bane investigated Stanley's allegations. Bane spoke to several employees, including Flannery. According to Bane, Flannery told him about the allegations of various sexual relationships by Center employees and managers and even discussed a pregnancy that supposedly resulted from one of those relationships. In addition, Bane recalled that Flannery mentioned that Stanley had read his letter to her and had shown her the exhibits to the letter prior to sending it to the DOL. By contrast, Flannery recalled that although Stanley had mentioned to her that he planned to write to the DOL, she had not helped Stanley prepare the letter. She also recalled that Bane asked whether she would tell the DOL about the allegations of sexual relationships and favoritism, and she said she would do so.

A day or two after Flannery spoke to Bane, Flannery was fired. According to Crump, Flannery was fired because she disclosed private information about students to non-Center employees when she either helped prepare or reviewed the attachments to Stanley's letter to the DOL, as well as because she spread unfounded and malicious rumors about her coworkers. Flannery recalled that she was told she was being fired for "gossip," but denied that she had ever gossiped about any of her coworkers. Flannery believed the real reason she was fired was because she was prepared to tell the DOL what she knew about the allegations.

## II.

Stanley and Flannery filed this action against Insights, Horizons, and Houston in Jefferson County, Kentucky, Circuit Court. The plaintiffs each brought a retaliation claim under the Kentucky Civil Rights Act ("KCRA"). The defendants removed to this court. This court then denied the

plaintiffs' motion to remand and dismissed the claim against Houston because he was not served within 120 days of the filing of the complaint.

Insights and Horizons have now filed a motion for summary judgment. After briefing of the motion for summary judgment was completed, the plaintiffs moved for leave to file a supplemental affidavit of Leondra Scott, which the defendants have opposed. The court will first address the summary judgment motion as originally briefed, before proceeding to discuss the motion for leave to file Scott's affidavit.

### III.

### 1. Summary Judgment Standards

To prevail on a motion for summary judgment, the movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine issue of material fact arises when there is sufficient evidence on which a jury could reasonably find for the non-moving party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1985). The disputed issue need not be resolved conclusively in favor of the non-moving party, but that party must present sufficient probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-289 (1968). Finally, the evidence must be construed in the light most favorable to the non-moving party. *Summers v. Leis*, 368 F.3d 881, 885 (6th Cir. 2004).

### 2. Standards for a Retaliation Claim

The KCRA forbids employers from discriminating against employees on the basis of the employee's sex. KRS § 344.040. KRS § 344.280 makes it unlawful for one or more individuals to "retaliate or discriminate in any manner against a person because he has opposed a practice declared

unlawful by this chapter, or because he has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this chapter."

Retaliation claims under the KCRA are evaluated using the same standards as apply to federal Title VII claims. *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435 (6th Cir. 2009). To assess claims of retaliation based on circumstantial evidence, the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies. *Id.*; *see Ford v. Gen. Motors Corp.*, 305 F.3d 545, 552-553 (6th Cir. 2002). Under that framework, a plaintiff first must establish a prima facie case of retaliation by showing the following: (1) the plaintiff engaged in a protected activity; (2) the defendant knew of the exercise of the protected right; (3) an adverse employment action was subsequently taken against the plaintiff; and (4) there was a causal connection between the protected activity and the subsequent adverse employment action. *Hamilton*, 556 F.3d at 435; *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008). If a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to provide evidence of a "legitimate, nondiscriminatory reason for its actions." *Hamilton*, 556 F.3d at 435 (quoting *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008). If the defendant meets that burden, then the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason is pretextual. *Hamilton*, 556 F.3d at 435; *Martin*, 548 F.3d at 412.

The defendants argue that the plaintiffs cannot make out prima facie cases of retaliation. The defendants further contend that, even if the plaintiffs could demonstrate prima facie cases, the defendants would be able to meet their burden of showing legitimate, non-discriminatory reasons for their actions, while the plaintiffs would not be able to show that the legitimate reasons were pretextual.

With respect to the first element a plaintiff must make out to establish a prima facie case, there are two types of protected activity: 1) "opposition to an apparent Title VII violation," the opposition clause; and 2) "participation in a proceeding" with the Equal Employment Opportunity Commission ("EEOC") or Kentucky Commission on Human Rights, the participation clause. *Wasek v. Arrow Energy*, 682 F.3d 463, 469 (6th Cir. 2012) (citing *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989)); *see* KRS § 344.280(1). With respect to the opposition clause, the plaintiffs must have had "a reasonable and good faith belief that the opposed practices were unlawful." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000) (quoting *EEOC Compliance Manual*, (CCH) ¶ 8006)). "When plaintiffs cannot satisfy the reasonable, good faith belief standard, an unreasonable mistake of law is generally the problem." *Wasek*, 682 F.3d at 469. The reasonableness requirement is necessary because it ensures that the employer understood, or at least could reasonably have understood, that the plaintiff was opposing unlawful conduct. *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276 (2d Cir. 1998). By contrast, under the participation clause, a plaintiff does not lose protection if he or she is wrong about the merits of the charge, or even if the charge is defamatory or malicious. *Booker*, 879 F.2d at 1312.

### 3. Stanley

Here, the evidence shows that Stanley complained to Cora Brown, the Human Resources Manager, and Charles Hobbs, Stanley's supervisor, about certain alleged sexual relationships between managers and employees. The question is whether Stanley's complaints to Brown constituted protected activity. And that question turns on whether Stanley had a reasonable and good faith belief that he was opposing unlawful practices.

Here, Stanley's specific complaints to Brown and Hobbs focused on favoritism shown by managers for their consensual sexual partners. Stanley expressed to Brown and Hobbs his view that the consensual relationships between managers and staff members was unprofessional and that the relationships led to such things as unfair distributions of the workload. However, although the Sixth Circuit has not yet addressed the issue, the federal courts that have addressed discrimination claims premised on preferential treatment for a consensual romantic partner have uniformly concluded that favorable treatment for a paramour does not constitute unlawful gender discrimination. *See, e.g.*, *Schobert v. Illinois Dep't of Transp.*, 304 F.3d 725, 733 (7th Cir. 2002); *Taken v. Okla. Corp. Comm'n*, 125 F.3d 1366, 1370 (10th Cir. 1997); *Becerra v. Dalton*, 94 F.3d 145, 149-150 (4th Cir. 1996); *DeCintio v. Westchester County Med. Ctr.*, 807 F.2d 304, 308 (2d Cir. 1986); *Krasner v. HSH Nordbank AG*, 680 F. Supp. 2d 502, 517-519 (S.D.N.Y. 2010).

Of course, the question here is not whether the activity opposed by Stanley was discrimination, but rather, as noted above, whether Stanley had a reasonable and good faith belief that he was opposing an unlawful practice. In other words, even though Stanley was not opposing unlawful discrimination when he voiced complaints about the favoritism shown by managers to the staff members with whom they were in romantic relationships, that does not end the inquiry. If Stanley's belief that he was complaining of unlawful discrimination was reasonable and in good faith, then he would nevertheless have engaged in a protected activity for which he could not be retaliated against.

However, the court finds that Stanley's belief that favoritism for paramours constituted unlawful gender discrimination was not reasonable, and thus he cannot show that he engaged in a protected activity. As the numerous cases finding that preferential treatment for a paramour does not

constitute gender discrimination make clear, nothing about the favoritism Stanley complained of had to do with the protected characteristic of gender. Instead, the alleged favoritism was based only upon a special relationship between certain staff members and managers. All other staff members, whether male like Stanley or female like Flannery, were equally negatively affected by the purported favoritism. Put another way, even accepting that Stanley had a reasonable factual basis for his complaints, the Center had no way to understand his complaints as relating to unlawful gender discrimination.

As far as this court is aware, every other court to have considered the issue has found that a plaintiff who expressed opposition to favoritism resulting from a consensual affair did not have a reasonable basis to believe he or she was opposing an unlawful practice. *Krasner*, 680 F. Supp. 2d at 520-522 (dismissing retaliation claim where "the overall content and context of [the plaintiff's] internal complaints suggest, at most, a consensual affair that – while perhaps unfair, bad for morale and detrimental to the department and the company – in itself harmed no one on account of a protected characteristic"); *Sherk v. Adesa Atlanta, LLC*, 432 F. Supp. 2d 1358, 1370-1372 (N.D.Ga. 2006) (holding that "the unanimity with which the courts have declared favoritism of a paramour to be gender-neutral belies the reasonableness of Plaintiff's belief that such favoritism created a hostile work environment"); *see Anderson v. Oklahoma State Univ. Bd. of Regents*, 342 F. App'x 365, 367-368 (10th Cir. 2009); *Mair v. Napolitano*, 2011 WL 6209799, at *5-*6 (W.D.Mich. Dec. 14, 2011); *Sullivan-Weaver v. New York Power Auth.*, 114 F. Supp. 2d 240, 243 (S.D.N.Y. 2000); *Harvey v. Chevron U.S.A., Inc.*, 961 F. Supp. 1017, 1033-1034 (S.D.Tex. 1997); *O'Patka v. Menasha Corp.*, 878 F. Supp. 1202, 1206-1209 (E.D.Wis. 1995). This court sees no reason to depart from the unanimous precedent on the subject.

Finally, to the extent that the plaintiffs contend that Stanley's complaint to the DOL also constituted protected activity under the participation clause – and its concomitant lack of a requirement that the participation be premised on a reasonable belief – that contention is easily disposed of. The undisputed evidence shows that Stanley made his complaint to the DOL after he was fired; thus, he was not fired in retaliation for making that complaint. Accordingly, he cannot show a causal connection between his complaint to the DOL and his firing, and a claim premised on that action would fail.

### 4. Flannery

To the extent that Flannery claims she engaged in a protected activity under the opposition clause of the KCRA, that claim fails for the same reasons as Stanley's: her belief that she was opposing unlawful activity was not reasonable. As with Stanley, Flannery's complaints amounted only to complaints about favoritism for paramours, unfairness in the distribution of work, and a generally unpleasant workplace. There is no way to interpret her complaints as having been about unlawful gender discrimination.

However, there is a wrinkle with Flannery's retaliation claim that is not present in Stanley's. Flannery was not fired until after Stanley's complaint to the DOL. Indeed, the ostensible reasons for Flannery's termination related to things that came to light during an internal investigation conducted pursuant to Stanley's DOL complaint. In fact, the company's stated reason for firing her actually related to her allegedly having helped Stanley prepare the DOL letter. The court turns to the question of whether participation in the filing of a complaint with the DOL or an ensuing internal investigation constitutes protected activity under the participation clause, which, as explained above,

does not require that the plaintiff have had a reasonable basis for believing that the complained-of conduct was unlawful.

To resolve that issue, the court turns to the language of Title VII and the KCRA. The KCRA states that it is unlawful for an employer to "[r]etaliate or discriminate in any manner against a person because . . . he has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this chapter." KRS § 344.280. Chapter 344 of the Kentucky Revised Statutes establishes the Kentucky Commission on Human Rights. KRS § 344.150. The Commission is empowered, *inter alia*, to receive and investigate complaints of unlawful practices, to hold hearings regarding those complaints, and to issue various orders relating to its findings. *See* KRS §§ 344.180, 344.200, 344.210, 344.230, 344.250. Similarly, Title VII states that it is unlawful for an employer "to discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3. Title VII creates the Equal Employment Opportunity Commission ("EEOC"), which is empowered to accept complaints of unlawful employment discrimination, investigate them, and take various enforcement actions. *See* 42 U.S.C. §§ 2000e-4, 2000e-5, 2000e-6, 2000e-8.

The language of the participation clause of the retaliation provisions in both the KCRA and Title VII specifically refer to proceedings and charges made under that particular chapter or subchapter, respectively. Thus, the KCRA prohibits employers from retaliating against someone for making a complaint to the Kentucky Commission on Human Rights or participating in an ensuing investigation, while Title VII prohibits retaliation for similar actions with respect to the EEOC. Here, though, the complaint was made to the DOL, not the Commission on Human Rights or the

EEOC.[5] Accordingly, the court finds that Flannery's alleged review of Stanley's DOL letter and her participation in the ensuing internal investigation did not constitute protected activities under the participation clause. *See Vasconcelos v. Meese*, 907 F.2d 111, 113 (9th Cir. 1990) ("Accusations made in the context of charges before the [EEOC] are protected by statute; charges made outside of that context are made at the accuser's peril."). Because, as stated above, Flannery also cannot show that she engaged in a protected activity under the opposition clause due to the unreasonableness of her belief that she was complaining about unlawful gender discrimination, the defendants are entitled to summary judgment on Flannery's claim of retaliation.

## IV.

After the motion for summary judgment had been fully briefed, the plaintiffs moved to supplement their response to the motion for summary judgment with an affidavit of Leondra Scott.[6]

The defendants object to the plaintiffs' motion to supplement as untimely, since it was filed over two months after briefing on the summary judgment motion had been completed. However, the court finds that the plaintiffs put forward a reasonable excuse for failing to provide Scott's affidavit to the defendants at an earlier time. Accordingly, the court will grant the plaintiffs' motion to supplement.

---

[5] Neither party sought to explain to the court why Stanley filed his complaint with the DOL, rather than the EEOC or the Kentucky Commission on Human Rights, if he truly believed that he was complaining of retaliation for opposing sexual discrimination. Based upon the portions of depositions and other pieces of the record that the parties have submitted to the court, it appears that the Center may be operated pursuant to a contract between one or both of the defendants and the DOL, suggesting that the DOL may have retained some contractual oversight of the operations at the Center. In any event, whatever the reason may be, Stanley chose not to file a complaint with the EEOC or the Kentucky Commission on Human Rights.

[6] Scott's name is now Leondra Shaw. However, for the sake of simplicity, the court will refer to her as Scott in this opinion.

Nevertheless, the court finds that Scott's affidavit does not affect the outcome of the summary judgment motion. In Scott's affidavit, she relates the details of her "sexual, romantic relationship" with Bolden. Scott states that Bolden flirted with her when he interviewed her for a job, and shortly thereafter, the two began dating. The relationship lasted for several months. During that time, Scott received a promotion to a higher-paid position for which she was not qualified and also carried a lower workload than employees who were not in relationships with managers. Scott further noted that employee-manager sexual relationships were common at the Center, and that she "witnessed numerous instances of managers giving preferential treatment to employees who would accept the managers' flirtations and inappropriate comments." In addition, Scott stated that she "also witnessed employees being harassed or discriminated against if they chose not to flirt with the managers," including by being terminated for declining the advances of managers. Scott stated that she personally accepted Bolden's advances because, as a widow with two children, she could not afford to be fired or disciplined.

Scott averred that she ended the relationship with Bolden upon learning that he was having a sexual relationship with another employee. After she did so, her workload increased and she was treated unprofessionally. Scott informed Blakemore about the relationship, who, Scott states, told management about Scott and Bolden's relationship; Blakemore was fired shortly thereafter. Bolden told Scott to lie about their prior relationship to anybody that investigated it. However, Scott avers, "after management realized that [she] would not play their games and would not keep secrets about their escapades," she was terminated. The company's stated reasons for firing her, which she believed to be untrue, were that she talked inappropriately to students and that the Center administration had found "inappropriate photographs on a students' cellphone."

The plaintiffs argue that Scott's testimony establishes that a *quid pro quo* harassment system existed at the Center. However, that is not the claim that the plaintiffs have brought. The claims brought by the plaintiffs were that they were retaliated against for their complaints. And, as explained above, the complaints made by the plaintiffs failed to set forth anything other than that the management at the Center showed favoritism toward those employees who were in consensual relationships with managers. Indeed, the plaintiffs point to no statements they made, whether it be in their complaints to Center management or in their deposition testimony, in which they suggest that the sexual relationships were anything other than consensual. That they have now found a person who is willing to suggest that some of the relationships were not wholly consensual or that persons who were unwilling to engage in such relationships suffered adverse consequences does not change the fact that the plaintiffs only complained that it was unprofessional for managers and employees to engage in consensual sexual relationships and unfair for the staff employees in those relationships to receive preferential treatment. Thus, Stanley and Flannery are simply wrong that Scott's affidavit proves that they "had a subjectively reasonable, objectively reasonable and factually accurate belief that they were both victims of, and reporting the existence of, sexual harassment."

## V.

Accepting the allegations made by Flannery and Stanley as true, the court is not unsympathetic to their complaints of unfairness and a lack of professionalism at the Center. However, the law does not regulate unfairness in the workplace as a general matter; it only prohibits disparate treatment based upon protected characteristics, such as a person's gender, race, or national origin. None of Flannery's or Stanley's complaints could reasonably be interpreted as protestations of discrimination based upon gender, rather than opposition to

displays by managers of favoritism for their consensual paramours. Accordingly, the court will grant the defendants' motion for summary judgment.

A separate order will issue in accordance with this opinion.

January 3, 2013

Charles R. Simpson III, Judge
United States District Court